**UNITED STATES of America**

v.

**Kevin C. REILLY, Defendant.**

**No. 94–CR–238.**

United States District Court,
N.D. New York.

Dec. 16, 1994.

James M. Kerrigan, Ithaca, NY, for defendant.

Thomas J. Maroney, U.S. Atty., N.D.N.Y. (Grant C. Jaquith, Asst. U.S. Atty., of counsel), Syracuse, NY, for U.S.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

In September 1992, defendant was convicted in a lower New York State court, pursuant to his guilty plea, of criminal possession of marijuana in the first degree and unlicensed growing of marijuana. Defendant's motion to vacate his judgment and for resentencing was granted on the ground that the District Attorney failed to advise defendant that the District Attorney had informed the United States Attorney of defendant's guilty plea, which lead to the United States initi-

ation of federal forfeiture proceedings against defendant's property. On appeal of defendant's resentencing, the New York State Appellate Division, Third Department, held that under the New York State Constitution the search of defendant's property was illegal and suppressed all evidence obtained from the search warrant as the fruit of an illegal entry. *People v. Reilly*, 195 A.D.2d 95, 606 N.Y.S.2d 836, 837–38, 840 (3rd Dep't 1993).

By a federal indictment filed June 30, 1994, defendant was charged with manufacture of marijuana and with criminal forfeiture of defendant's property used to grow the marijuana. Before the court is defendant's motion to suppress evidence seized pursuant to a search warrant. Defendant further seeks discovery and suppression of the government's evidence that defendant grew and supplied marijuana prior to September 6, 1991, the date on which he was initially arrested. In addition, defendant moves for severance of the charges against him. The court heard oral arguments on the instant motions on September 9, 1994 in Syracuse, New York. On October 20, 21 and 28, 1994 the court held a suppression hearing in the instant matter. Pursuant to Fed.R.Crim.P. 12(e),[1] the following constitutes the court's findings of fact and conclusions of law.

## FINDINGS OF FACT

The court begins with a description of defendant's property as it existed on the day of the allegedly unlawful search. The approximately 11 acres of land owned by defendant was formerly a farm field located on Woodard Road, in the Town of Enfield, New York. Along with the main residence and a cottage,[2] defendant built a second house on the property.[3] In about 1981, Ruldolfo Nunez, who owns the property bordering the east, west and north portions of defendant's land, hired defendant to build a multi-strand

1. Rule 12(e) of the Federal Rules of Criminal Procedure requires a court to set forth findings of fact on motions to suppress.

2. Throughout the suppression hearing, defendant referred to the structure in question, located toward the north boundary of the property, as a "cottage" while the government characterized

the structure as a "grow house" or "building". For the sake of clarity, the court refers to the structure as the "cottage".

3. Defendant subsequently sold the second house, located east of the main residence and near defendant's east property line.

wire fence along this border to keep Mr. Nunez's dairy cows from straying onto defendant's property.

Sometime between 1987 to 1989, defendant had a local farmer plant a lawn on the entire area of defendant's property between the main residence and the north boundary line as well as from the main residence to Woodard Road. A large tractor was used to till the soil and to plant seed. After the grass began to grow, the lawn was extensively rolled. At about the same time, defendant hired a local resident who mowed the lawn, tended gardens and placed mulch around most of the trees located on the property through September 1991. While the area between the main residence and the north boundary line was regularly mowed with both a push and riding mower, the front portion of the lawn, between the main residence and Woodard Road, was regularly mowed with a brush hog. In September 1991, the time of the allegedly unlawful search, the lawn had substantially grown throughout defendant's property, although it had been very dry as a result of drought conditions during the preceding summer months.

On a regular basis, defendant landscaped the property with topsoil and mulch. Most of the trees located between the main residence and the north boundary were mulched prior to the search of the property in September 1991. Defendant planted numerous trees throughout the parcel of land, including about 140 trees along the west hedgerow. Defendant also had an excavating contractor build a pond near the northeast corner of the property, which defendant used for recreational fishing and swimming, including nude swimming. Near the pond, a wooden gazebo was built that contained a stone fireplace and chimney for outdoor cooking. In addition, the gazebo area had an electrical hookup to allow defendant to play music. Located adjacent to the pond was a grass "patio area" constructed with a stone wall. The patio area, which was frequently used by defendant and invited guests for games, such as badminton and croquet, had several "adirondack-style" lawn chairs placed throughout.

Located near the pond and patio area was the cottage, which is about 375 feet from the main residence. Defendant moved into the cottage after he finished its construction in about 1984, and resided there until 1986. He then moved into the main residence and rented the cottage until 1990, after which it remained vacant through September 1991. During the time that defendant was not renting the cottage, in 1990 and 1991, he and his guests occasionally used the bathroom and kitchen facilities. On numerous occasions, defendant used the cottage for sexual liaisons. He also used it to grow marijuana.

Tompkins County Sheriff's Deputy Scott Ferris and Investigator Daniel C. Drew first visited defendant's property in about September 1990. On that occasion, they approached defendant's parcel of land from the north and walked south along the western fence line until they reached Woodard Road. Upon approaching a point of the fence closest to the wooded area between defendant's main residence and the cottage, the officers noticed a "strong odor of marijuana." They did not enter the property, however, because a dog was present. The officers did not obtain a search warrant as a result of their September 1990 observations and did not revisit defendant's property until about one year later.

At about 1:30 p.m. on September 6, 1991, Officers Drew and Ferris again drove to defendant's property and parked their patrol car along the road about 300 yards east of defendant's main residence. They walked in a north-westerly direction through an overgrown neighboring field toward the east boundary of defendant's property until they approached a fence. Upon reaching the eastern fence line, the officers followed the fence to the north-east corner of defendant's property. The officers then walked west through a densely wooded area along the north border of the parcel. At a point close to the northwest corner, they turned south and entered defendant's property at a site where the fence was knocked to the ground and covered by brush. While the officers did not observe a fence along the north boundary of the property, they did notice it along both the east and west property lines and believed

that it may have been electrified. Although the fence was composed of only a single strand of wire where the officers first encountered it, much of the fence was constructed with three to six strands of wire along the perimeter.

After entering defendant's property the officers walked south, passing the vegetable garden, pond and gazebo. Near the pond was a farm tractor, with its engine running, connected to a water pump. The officers proceeded past the patio area to the cottage. The cottage had windows on all sides, some of which were open and some which had drawn curtains. Several pieces of scaffolding were leaning against the cottage and a pile of manure, a flat-bed trailer and small cement mixer were nearby. Built into the side of the cottage was an air conditioner, that was operating at the time. The officers walked close to the air conditioner and detected a "very strong odor of marijuana" being discharged from the rear of the unit. After detecting the marijuana odor, the officers attempted to look inside the windows located nearest to the air conditioner, which were closed. Two of the windows were covered with a screen on the outside of the cottage. On the inside of each window was a drawn curtain through which they could not see. They walked to the north side of the building and looked through a picture window and into an empty room with dust and cobwebs on the floor and a fireplace. The building appeared "deserted". The officers also looked into several other windows and saw a bathroom and kitchen. The kitchen had cabinets, a refrigerator and a counter area.

As to the air conditioner from which the officers allegedly detected the odor of marijuana, defendant purchased the unit in about 1988 and installed it in his main residence. Shortly thereafter, defendant removed the unit and stored it in a barn until the spring of 1991, when he installed it in the cottage. The type of unit used by defendant is designed to recirculate inside air at a rate of about 700 cubic feet per minute. Outside air is drawn into the air conditioner and circulated over condenser coils before being exhausted to the outside. Thus, theoretically, no air from inside the cottage is passed by the air

conditioner to the outside. In reality, however, similar units were tested by the manufacturer, they leaked an average of 3 cubic feet per minute of inside air to the outside. Some units leak as much as 15 to 25 cubic feet per minute.

After viewing the cottage, the officers continued south, crossing a gravel driveway leading to the cottage and through an area of mowed grass until they reached a wooded area about 125 feet from the cottage. The officers were wearing dark clothing and ran in a crouched position so as not to be seen. They located a clearing with about 20 growing marijuana plants. The officers left the wooded area and defendant's property by retracing the route used to enter the parcel. They subsequently obtained a search warrant based upon an affidavit containing the observations made during the September 6, 1991 search of defendant's property. Upon execution of the warrant, the officers found about 15 growing marijuana plants in the cottage and about 115 plants growing in the wooded area. One marijuana plant was found inside defendant's main residence, and some harvested marijuana was found in a kitchen cupboard, along with implements for weighing and bagging.

## DISCUSSION

### A. Suppression

#### i. Materially False Statements in Search Warrant

Defendant first seeks suppression of the marijuana and related items seized pursuant to a search warrant because the application for the warrant allegedly contained materially false statements; namely, that the officers who searched defendant's property detected a strong odor of marijuana emanating from an air conditioner located in the cottage.

■■■ Under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), evidence seized pursuant to a warrant based on materially false and misleading information is inadmissible at trial. *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676–77. Thus, the court must determine whether any false statements made knowingly or inten-

114

tionally, or with reckless disregard for the truth, were included in the search warrant application. As a starting point, the court presumes that the affidavit supporting the search warrant is valid. *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676–77. At a *Franks* hearing, defendant has the initial burden of going forward. The burden of production shifts, however, once defendant establishes some basis for the motion. The standard of proof is a preponderance of evidence. *United States v. Levasseur,* 618 F.Supp. 1390, 1392 (E.D.N.Y.1985).

█ While the air conditioning unit installed in the cottage was designed such that no air from inside the cottage is passed to the outside, the record shows a substantial likelihood that air actually passed from inside the cottage to the outside through the unit. After a review of all the evidence adduced at the hearing, the court concludes that the government has met its burden of proof in showing that the officers detected an odor of marijuana emitting from the air conditioner. Thus, in so far as it is based on a theory that the officers' warrant application was false or misleading, defendant's motion to suppress is denied.

*ii. Unlawful Entry*

Defendant next seeks to suppress evidence seized pursuant to the September 6, 1991 search warrant, on the ground that the warrant was the product of an unconstitutional search of his property.

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Although the United States Supreme Court has never stated that a warrant is required for each search, the Court has repeatedly stated a strong preference for a search warrant.[4] "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). In the landmark case *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court established the now familiar standard of Fourth Amendment analysis: whether a person has a "constitutionally protected reasonable expectation of privacy." *Katz,* 389 U.S. at 360, 88 S.Ct. at 516. However, the Fourth Amendment does not protect merely subjective expectations of privacy, but "one society is prepared to recognize as 'reasonable'." *Katz,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring). Because the officers in the instant case searched defendant's property prior to obtaining a warrant, "the government faces the burden of showing that this search and seizure fits within one of the narrowly tailored exceptions to the warrant requirement of the Fourth Amendment." *United States v. Seidel,* 794 F.Supp. 1098 (S.D.Fla.1992) (evidence suppressed because police conducted warrantless search of curtilage area surrounding home).

In *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), the Supreme Court expressly recognized an exception to the search warrant requirement when it upheld a warrantless search conducted in an open field. Justice Holmes succinctly explained that "it is enough to say that . . . the

---

4. Commenting on the preference for a search warrant, the Supreme Court has explained:

The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14 [68 S.Ct. 367, 367, 92 L.Ed. 436] (1948). Once a lawful search has begun

it is also far more likely that it will not exceed proper bounds when it is done pursuant to a judicial authorization "particularly describing the place to be searched and the persons or things to be seized." Further, a warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search and the limits of his power to search. *United States v. Chadwick,* 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977).

special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects' is not extended to the open fields. The distinction between the latter and the house is as old as the common law." *Hester*, 265 U.S. at 59, 44 S.Ct. at 446. In *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court reaffirmed the holding in *Hester* that warrantless intrusions into open fields do not constitute a violation of the Fourth Amendment. *Oliver*, 466 U.S. at 177, 104 S.Ct. at 1740–41. The *Oliver* Court reasoned that activities conducted in an open field are not protected because "open fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended to shelter from government interference or surveillance." *Oliver*, 466 U.S. at 178, 104 S.Ct. at 1741. Addressing itself to the reasonableness standard set forth in *Katz*, the *Oliver* Court stated that an "expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.'" *Oliver*, 466 U.S. at 179, 104 S.Ct. at 1742. More importantly for the case at bar, the *Oliver* Court recognized that an "open field" should be distinguished from the "curtilage," which consists of "the land immediately surrounding and associated with the home," and thus "warrants the Fourth Amendment protections that attach to the home." *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742. Without considering "the scope of the curtilage exception to the open fields doctrine or the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself," the *Oliver* Court explained that "the term 'open field' may include any unoccupied or undeveloped area outside of the curtilage." *Oliver*, 466 U.S. at 180 n. 11, 104 S.Ct. at 1742 n. 11. Qualifying that definition, the Court added that "[a]n open field need be neither 'open' nor a 'field' as those terms are used in common speech. For example ... a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." *Oliver*, 466 U.S. at 180 n. 11, 104 S.Ct. at 1742 n. 11. Because "the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" curtilage has been afforded Fourth Amendment protections that attach to the home itself. *Oliver*, 466 U.S. at 180, 104 S.Ct. at 1742 (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886)). The central issue for the case at bar, therefore, is whether the officers' observations of the growing marijuana on defendant's property were made from within the constitutionally protected curtilage of defendant's home.

■ A determination of the scope of a home's curtilage is a question of fact. *Williams v. Garrett*, 722 F.Supp. 254, 260 (W.D.Va.1989) (citing *United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir.1983), cert. denied, 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984)). In *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Supreme Court set forth four factors as an aid in defining the scope of a home's curtilage:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139 (citations omitted). Addressing the above factors, the Supreme Court cautioned they should not be applied in a mechanical fashion. "Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301, 107 S.Ct. at 1140. The "central component" of the curtilage inquiry, then, is "whether the area harbors the 'intimate activity associated with the "sanctity of a man's home and the privacies of life.'" *Dunn*, 480 U.S. at 301, 107 S.Ct. at 1139 (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

In *Dunn*, federal agents tracked to the defendant's ranch the shipment of large quantities of chemicals and equipment used

in the production of controlled substances. Aerial photographs of the ranch showed the truck used to transport the materials backed up to a barn located near the ranch house. The entire perimeter of the approximately 198 acre ranch was fenced and several other fences were located within the perimeter fence. One of the internal fences surrounded the house, located about one-half mile from a public road, and was located about 50 yards from the barn. Officers crossed several fences, two of which contained barbed wire, and shined a flashlight through a barn door that was open except for the presence of a locked gate. The officers, who were led to the barn by the smell of chemicals used in the production of controlled substances, observed what appeared to be a drug laboratory through the barn door. The officers left the premises and returned twice the following day to confirm their initial observations before obtaining a search warrant. *Dunn,* 480 U.S. at 296–99, 107 S.Ct. at 1137–39.

Applying the four factor analysis, the *Dunn* Court determined that the defendant's barn lay outside the curtilage of the house. First, the Court noted that the barn was located 60 yards from the house and 50 yards from the fence surrounding the house. Without explaining why, the Court found the distance to be "substantial." Second, the barn was located outside the fence surrounding the house. In discussing the presence of the enclosure of the ranch house, the Court noted that

> [v]iewing the physical layout of respondent's ranch it its entirety, it is plain that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house. Conversely, the barn—the front portion itself enclosed by a fence—and the area immediately surrounding it, stands out as a distinct portion of respondent's ranch, quite separate from the residence.

*Dunn,* 480 U.S. at 302, 107 S.Ct. at 1140 (internal citation omitted). Third, the Court gave special significance to the fact that the agents "possessed objective data indicating that the barn was not being used for intimate activities of the home:" aerial photographs and the presence of an "extremely strong odor" of chemicals detected by the agents while standing on defendant's property, but outside the curtilage of the ranch house. *Dunn,* 480 U.S. at 302–04, 107 S.Ct. at 1140–41. Fourth, defendant "did little to protect the barn area from observation by those standing in the open fields" since the record showed only that the fences were "constructed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas." *Dunn,* 480 U.S. at 303, 107 S.Ct. at 1140. The court believes that the *Dunn* factors constitute an appropriate starting point for a determination of what constitutes the curtilage of defendant's home within the meaning of the Fourth Amendment.

■ Before applying the *Dunn* factors to the instant case, the court notes that several additional principles must be kept in mind when undertaking a curtilage analysis. First, "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts." *United States v. Depew,* 8 F.3d 1424, 1426 (9th Cir.1993). As the Supreme Court noted in *Oliver,* "[n]o single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant." *Oliver,* 466 U.S. at 177, 104 S.Ct. at 1741. Also, in assessing what constitutes curtilage, a court should be mindful that the concept may change from an urban to a rural area. *United States v. Arboleda,* 633 F.2d 985, 992 (2d Cir.1980) ("In a modern urban multifamily apartment house, the area within the 'curtilage' is necessarily much more limited than in the case of a rural dwelling subject to one owner's control." (citation omitted)).[5]

---

5. Indeed, the majority in *Oliver,* in criticizing the dissent in that case for its characterization of open fields as "bustling with private activity," seemed to indicate what it envisioned as an open field when it stated that

> [t]hese fields, by their very character as open and unoccupied, are unlikely to provide the

setting for activities whose privacy is sought to be protected by the Fourth Amendment. One need think only of the vast expanse of some western ranches or of the undeveloped woods of the Northwest to see the unreality of the dissent's conception.

■ The curtilage analysis is shaped by yet another consideration. Several courts adopt the view that it does not matter whether "officers first trespass upon property that is obviously curtilage ... while investigating a tip, as long as the incriminating observations themselves take place outside the protected curtilage." *See, e.g., United States v. Traynor,* 990 F.2d 1153, 1157 (9th Cir.1993) (noting that the Fifth Circuit in *United States v. Pace,* 955 F.2d 270 (1992), adopted the same approach). The *Traynor* court noted that the "obvious implication of *Dunn,* in which police officers first entered the defendant's property before making observations of a barn, is that observations made by officers while they are not within the curtilage of a house do not constitute an unreasonable search under the Fourth Amendment." *Traynor,* 990 F.2d at 1157. This court agrees that observations made by officers standing in open fields do not constitute an unreasonable search, even if the officers first trespassed upon property that is obviously curtilage.

■ In the case at bar, the court also must decide whether defendant's cottage generated its own curtilage. Defendant lived in the cottage for several years after first building the structure, but he was not residing there at the time of the search. In fact, the cottage had been unoccupied as a residence for nearly two years at the time of the property search in September 1991. While defendant occasionally used the cottage throughout that two year period, that use cannot be characterized as generally associated with the use as defendant's home. Thus, the court concludes that the cottage was not being used as a home by defendant in September 1991, and that an analysis of the extent of the curtilage in the instant matter must relate to that curtilage, if any, extending from defendant's main residence located near Woodard Road. Having set forth the appropriate rules of law, the court turns to an analysis of the essential facts of the instant case.

*a) Proximity*

■ In *Dunn* the outbuilding was 180 feet from the residence. Here, the cottage was about 375 feet from the main residence. Also the wooded area was within several hundred feet from the residence. There is no fixed distance at which curtilage ends and open fields begin. *See United States v. Depew,* 8 F.3d 1424, 1427 (9th Cir.1993) ("A distance of 50–60 feet ... clearly does not compel a finding of curtilage."). Standing alone, the distance between the main residence and the cottage and wooded area may be viewed as substantial, particularly in comparison to distance from the ranch house to the barn in *Dunn.* However, viewed in conjunction with the other factors, the distances are not so great as to preclude a finding that both the cottage and the wooded area fall within the main residence's curtilage. *See Depew,* 8 F.3d at 1427. In addition, as noted above, in assessing what constitutes curtilage, a court should be mindful that the concept may change from an urban to a rural area. *United States v. Arboleda,* 633 F.2d 985, 992 (2d Cir.1980). In the case at bar, defendant's 11 acres of property consists primarily of well maintained rural property which starkly contrasts to the surrounding area of thick woods and farm fields. Viewing defendant's property as a whole, the distance between the main residence and the wooded area and cottage does not lead the court to conclude that those areas lay outside the curtilage of the home.

*b) Enclosure*

Defendant's land is enclosed on three sides by a wire fence consisting of anywhere from one to six strands, although some of the fence along the north border of the property is not standing. The original purpose of the fence was to keep cattle from straying onto defendant's property, but that use became unnecessary when defendant's neighbor discontinued use of the adjacent land to graze his dairy cattle. It is significant that defendant's property is bordered by hedgerows, partly constructed by defendant, along the east and west boundaries, and a thickly wooded area along the north boundary. *See Williams v. Garrett,* 722 F.Supp. 254, 261 (W.D.Va.1989) ("[R]eading the word 'enclosure' in *Dunn* to require an artificial barrier

*Oliver,* 466 U.S. at 179 n. 10, 104 S.Ct. at 1742    n. 10.

seems unduly narrow. The boxwood hedge and the heavy woods created a natural enclosure around the home and yard; requiring a person to expend resources and sacrifice aesthetics by building a fence in order to obtain protection from unreasonable searches is not required by the constitution.").

Second, the court notes that, unlike the situation in *Dunn*, there is no fence separating the main residence from the wooded area or the cottage so as to clearly mark the boundary separating the curtilage from the remaining property. Nor does the court conclude that the wooded area serves to separate the main residence from the remaining property. The Supreme Court "has declined to adopt the bright line rule that curtilage extends no further than the nearest fence surrounding a fenced house." *Depew*, 8 F.3d at 1427 (citation omitted). In *Dunn*, the court explained that while

> [f]encing configurations are important factors in defining curtilage . . . the primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home. Application of the . . . "first fence rule" might well lead to diminished Fourth Amendment protection in those cases where a structure lying outside a home's enclosing fence was used for such domestic activities. And, in those cases where a house is situated on a large parcel of property and has no nearby enclosing fence, the [first fence rule] would serve no utility; a court would still be required to assess the various factors outlined above to define the extent of the curtilage.

*Dunn*, 480 U.S. at 301 n. 4, 107 S.Ct. at 1139 n. 4.

Viewing defendant's property in its entirety, the court does not find that any fence or natural structure can be said to clearly mark the limits of the curtilage between the main residence and the wooded area and the cottage. Nor does the court find that the wooded area between the main residence and the cottage constitutes a fence or enclosure of the type envisioned by the Supreme Court in *Dunn*.

### c) Use

Defendant made frequent use of the back portion of his property for a variety of private activities. In the summer, defendant often used the pond for fishing and swimming. On many occasions, invited guests used the pond for swimming, and on numerous occasions the defendant or his guests would swim nude. The gazebo area was also frequently used for games, such as croquet and badminton, and for cooking in the stone barbecue. In addition, the gazebo area had an electrical hook-up to allow defendant to play music. During the period of time that the cottage was not being rented, defendant occasionally used its kitchen to store food and beverages. On occasion, defendant and guests would use the cottage's bathroom, and the kitchen was used to prepare food. On a number of occasions, defendant used the cottage for sexual liaisons.

The court also finds significant defendant's extensive improvements to his property. In preparing the property for recreational and leisure use, defendant made numerous renovations to what had been a cow pasture. Defendant's improvements gave the property a park-like appearance to a substantial portion of the property. In fact, the portion of property to the north of defendant's main residence appears to have been better maintained than the lawn area between the main residence and Woodard Road. *See, e.g., United States v. Sumner*, 793 F.Supp. 273, 275 (D.Kan.1992) (of defendant's 240 acre property, "only the manicured area of approximately four or five acres constitutes the curtilage").

In its analysis of the third factor pertaining to use of the property, the *Dunn* court found it "especially significant" that the officers "possessed objective data," such as aerial photographs, that the building at issue was being used to manufacture illegal drugs. *Dunn*, 480 U.S. at 302–03, 107 S.Ct. at 1140–41. In the case at bar, Officers Drew and Ferris, before entering defendant's property, did possess some objective data that the property was being used to grow marijuana. Approximately one year before, they observed an odor of marijuana while standing in a field adjacent to defendant's property.

Also, the warrant application states that defendant was a "known associate of Nancy Carl, who is known to [the affiant] to have a record of growing marijuana." The application also stated that Ms. Carl had "recently" pled guilty to criminal possession of marijuana and that she had told the affiant that defendant "had been her boyfriend." There is no other evidence that the officers possessed objective data that defendant used his property to grow marijuana.

The court notes that once on the property the officers did observe a strong odor of marijuana coming from the air conditioning unit on the cottage. That observation, together with the presence of the manure pile and what appeared to be an otherwise empty building, may have lead the officers to reasonably believe that the cottage contained marijuana. However, the court would be guilty of bootstrapping if it were to consider the observations made by the officers while standing within the area alleged to constitute curtilage in making its determination as to whether that area is in fact part of the curtilage of defendant's property. The situation presented in the case at bar must be distinguished from that in *Dunn,* in which the Supreme Court considered the observations made by the officers while on the defendant's property. In that situation, the officers stood in an area outside the curtilage of the defendant's residence and looked inside a barn's open front. *Dunn,* 480 U.S. at 304, 107 S.Ct. at 1141. In the instant case, however, the alleged area of curtilage is the whole of defendant's property surrounding both the cottage and the wooded area between the main residence and the cottage.

On balance, while it can be said that the officers had some objective data that the property in question was not used for intimate activity associated with the sanctity of the home and the privacies of life, that evidence was very weak, at best, and standing alone does not provide a sufficient basis for the court to conclude that the curtilage did not extend over those areas in question.

*d) Steps taken to prevent observation*

The cottage area is located several hundred feet from the road and the wooded area stands between the cottage and the road. A long driveway leads from Woodard Road along the west property line, past the main residence, the cottage and pond and ultimately circles back to the main road along the east boundary line. The wooded area itself is located several hundred feet from Woodard road, and stands between the main residence and the cottage and pond. The fences were constructed to keep cows from the adjoining farm from straying onto defendant's property. Defendant did not post any "no trespassing" signs along his property line, and there is nothing in the record to suggest that the signs posted by defendant's neighbor were intended by defendant to keep trespassers off defendant's property. However, it is not insignificant that defendant did not allow trespassers on his property and the only persons who used his property were invited guests. As one court has recently stated,

> it is irrelevant whether the public knows why an individual craves privacy. It is relevant simply that [the defendant's] numerous efforts to ensure privacy were not in vain, as uninvited guests had never previously entered the property.

*Depew,* 8 F.3d at 1428.

In summary, the court concludes that the officers violated defendant's Fourth Amendment rights when they searched his property without a warrant on September 6, 1991. This conclusion is mainly premised on the layout of defendant's property at the time of the warrantless search. Unlike the property in *Dunn,* defendant's property was not subdivided by fencing. The grounds were groomed and well maintained, and although the boundary fencing was down at several locations, it should have been readily apparent to an observer that the groomed area of the property was private. In addition, although the fence was constructed to keep out stray cows, defendant took other affirmative steps to assure the privacy of the grounds, such as the planting of trees along the property's perimeter. Also, although the area of defendant's property is large, the rural nature of the area mitigates that fact. Viewed as a whole, an observer could reasonably conclude that the area in question "harbors

the 'intimate activity associated with the sanctity of a man's home and the privacies of life.' " *Dunn,* 480 U.S. at 301, 107 S.Ct. at 1139 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).

In short, the officers had no right to approach the cottage or wooded area without a warrant, because the nature of the grounds made it apparent that it was part of the curtilage of defendant's home.

### B. Collateral Estoppel

Defendant further moves to suppress evidence under the doctrine of collateral estoppel. As a basis for the motion, defendant asserts that the United States brings this action at the request of, and for the benefit of the state. Courts have recognized that pursuant to the doctrine of collateral estoppel, a non-party to an action can be bound by the determination of issues decided in that action if it controls or substantially participates in the control of the presentation on behalf of a party. *United States v. Davis,* 906 F.2d 829, 833 (2d Cir.1990). However, the Second Circuit has long held that "collateral estoppel never bars the United States from using evidence previously suppressed in a state proceeding in which the United States was not a party." *Davis,* 906 F.2d at 832.

Defendant attempts to distinguish the instant case from *Davis* by stressing that even though the United States was not a party to the state action, the "agreement" between the United States and the state district attorney to commence this action after the state action was dismissed warrants treating the United States as if it had been a party to the state action. The court disagrees. The case law is clear that where, as here, the United States was neither a party in the state suppression hearing nor a participant in the subsequent appeal, the United States is not barred from using evidence previously suppressed in state court. Therefore, defendant's motion to suppress any evidence based on the doctrine of collateral estoppel is denied.

### C. Severance

Defendant also moves for severance of count I, charging unlawful manufacture of marijuana, from count II, charging criminal forfeiture of the property located at 60 Woodard Road, Town of Enfield, New York, which was used to grow the marijuana.

Rule 8 of the Federal Rules of Criminal Procedure permits joinder of offenses in the same indictment or information where they "are based on two or more acts or transactions connected together." Fed. R.Crim.P. 8(a). While no one characteristic is sufficient *per se* to establish similarity of offenses for purposes of Rule 8(a), joinder is proper when the same evidence may be used to prove each count. *See United States v. Blakney,* 941 F.2d 114, 116 (2d Cir.1991). Because in the instant case the forfeiture charged in count II is based on the substantive crime charged in count I, joinder is appropriate.

When joinder is proper under Rule 8, a defendant may move under Federal Rule of Criminal Procedure 14 for separate trials of counts charged in the same indictment if he believes joinder is prejudicial. The decision whether to grant a motion for severance is "committed to the sound discretion of the trial court." *United States v. Harwood,* 998 F.2d 91, 95 (2d Cir.1993).

The basis for defendant's severance motion in the instant case is his desire to testify at trial on count II but not count I. The court concludes that the most efficient way to accommodate defendant's concerns is to bifurcate the trial, in the event one is held, into guilt and penalty phases. The jury will first determine defendant's guilt or non-guilt, and only upon conviction will the jury be informed of the forfeiture count. This type of arrangement has been strongly favored by courts to protect defendants' rights and to prevent jury confusion, and adequately addresses both defendant's concerns and the government's interest in judicial economy. *United States v. Desmarais,* 938 F.2d 347, 349–50 (1st Cir.1991). Because the potential for prejudice to defendant in a trial on both counts is obviated by a bifurcated trial, defendant's motion for severance is denied.

### D. Prior Bad Acts

Defendant seeks discovery and suppression of the government's evidence that defendant grew and supplied marijuana prior to September 6, 1991. In response, the government states that it need not supply defendant with a list of its expected witnesses, and under the Jencks Act it need not produce statements of potential witnesses prior to their actual testimony. At oral argument the government confirmed that the nature of its evidence with regard to defendant's prior bad acts is testimonial. Thus, the government has informed defendant of the nature of the bad act evidence it intends to introduce at trial, in satisfaction of the notice requirement of Rule 404(b) of the Federal Rules of Evidence. Further, the government is correct in its assertions regarding disclosure. First, defendant has failed to make a particularized showing of the need and materiality to justify discovery of the government's list of potential witnesses. *United States v. Cannone*, 528 F.2d 296, 301 (2d Cir.1975). Second, the government need not disclose materials relating to the credibility of its witnesses until the time of trial. *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Finally, the government need not reveal informant information. *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957).

In addition, having failed to show facts which, if proven, would support suppression of potential prior bad act evidence, defendant has met neither the standard for suppression nor that for a suppression hearing. *Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir.1991). The court, therefore, denies defendant's motion so far as it seeks suppression.

### CONCLUSION

After a careful analysis of the *Dunn* factors, and the general principles set forth at the outset of the analysis, the court concludes that the observations made by Officers Drew and Ferris of the cottage and the wooded area were made while standing within the curtilage of defendant's main residence. Thus, since the government failed to show that the officers had a right to be on the property without a warrant, any testimony concerning knowledge acquired during the unlawful search must be excluded from evidence at trial. In addition, because the search warrant affidavit was replete with information obtained during the unlawful entry, any tangible materials seized pursuant to that warrant, and any derivative evidence, tangible and testimonial, must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963); *Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 2532–33, 101 L.Ed.2d 472 (1988).

In summary, it is hereby ORDERED that defendant's motion to suppress based upon the officers' unlawful entry of defendant's property is GRANTED and the government's evidence is hereby SUPPRESSED, consistent with the discussion above. Defendant's alternative bases to suppress evidence based upon materially false representations in the search warrant, and upon the doctrine of collateral estoppel are hereby DENIED. Defendant's motion for severance is DENIED, however, in the event of a trial, the trial shall be bifurcated, consistent with the court's decision above. Defendant's motion for discovery and suppression of prior bad act evidence is DENIED.

It is so ORDERED.