**UNITED STATES of America**

v.

**James SEIDEL.**

**No. 91–6217–CR.**

United States District Court,
S.D. Florida.

April 23, 1992.

---

Michael Walleisa, Asst. U.S. Atty., Fort Lauderdale, Fla., for plaintiff.

Roy J. Kahn, Harry Soloman, Miami, Fla., for defendant.

## ORDER

GONZALEZ, District Judge.

THIS CAUSE has come before the Court upon the defendant James Seidel's motion to suppress evidence and statements. The Court heard oral argument on this motion on February 21, 1992.

### Facts

Defendant James Seidel operates a plant nursery in semi-rural Broward County. The area contains single family dwellings as well as mixed use and commercial properties on larger than average parcels of land. The neighborhood itself is zoned for mixed residential and agricultural use. The houses in the immediate area sit on large lots, from approximately one to three acres in size.

The defendant lives on his two and one-half acre parcel and operates the small private nursery to which the public does not have access. Trees and almost impenetrable foliage surround the entire tract, severely limiting the ability of passers-by to look into the property. There is a gate providing vehicular and pedestrian access to the property from a public road. A fence surrounds the property on three sides, with the fourth boundary being clearly marked by trees and other foliage. The unfenced portion of the property abuts a vacant lot overgrown with trees, bushes, and tall grass. Because of the heavy vegetation, the public cannot see onto the property except at the area immediately adjacent to the gate. "No Trespassing" signs are posted around the perimeter of the property. The only gate onto the premises is always locked and bears a sign advising "Beep Horn and Wait."

The property contains a large structure variously referred to as a "house," a "structure," a "barn," and a "building". The "house" contains a large interior storage area, used as a warehouse, entry to which is through two large sliding aluminum doors. According to the police, these doors give the building a "barn-like" appearance. The building also contains defendant's living quarters and has been his home continuously since 1985.

At approximately 2:00 pm on Friday, October 18, 1991, agents of the Florida Department of Law Enforcement (FDLE) flew over defendant's property in a helicopter and observed what they believed to be marijuana plants growing on defendant's land. The agents in the helicopter notified ground based officers who were stationed some distance away of their findings. The airborne officers then directed the ground officers to defendant's residence. Although the courts were open that afternoon (it was a regular business day), and even though several of the officers involved were carrying portable telephones and could have secured a search warrant by telephone, neither the ground officers nor the airborne officers attempted to procure a search warrant for defendant's property prior to arriving at defendant's premises.[1]

About one hour after being first contacted, the ground based agents arrived at the scene and stopped at the defendant's locked gate where the sign instructed "Beep Horn and Wait." The defendant observed their arrival, walked from the building located on the nursery grounds to the gate, spoke briefly to the officers, and inquired as to their business. At least four officers were present; the two who spoke to the defendant were clearly armed with pistols in plain sight on their belts. The FDLE helicopter was hovering overhead during this conversation.

The officers notified Mr. Seidel that the helicopter had spotted marijuana growing on the property and that the agents intended to conduct a search of the premises and further intended to seize any marijuana they might find. Mr. Seidel, after objecting to the officers entering upon his property without a warrant, returned to the house to get a key to unlock the gate. While retrieving the key, Seidel made the first of two phone calls to his attorney.

Upon returning to the gate, the defendant challenged the officers' authority to enter his property. Defendant Seidel asked, "Do I have to let you in?", and "Do you have a search warrant?" Agent Hunt responded, "If you don't let us in, we're coming in anyway." In addition to stating "we're coming in anyway," Agent Hunt advised defendant this lot was "an open field" and that they "didn't need a warrant."

In light of these comments by the officers, the defendant unlocked the gate, whereupon the officers entered the property and found a large number of marijuana plants under cultivation. Once on the property, the officers requested permission to use the defendant's telephone inside the house, which permission was granted. Once inside the officers found harvested marijuana on a desk. At this time Mr. Seidel asked for and was granted permission to call his lawyer which call was made from a mobile phone located in Seidel's vehicle. Mr. Seidel's lawyer spoke to both the defendant and to an officer at the scene. Inquiries were made as to whether the police had a search warrant and whether Mr. Seidel was under arrest.[2] Defendant's lawyer informed the officers that they did not have permission to be on the property nor to search the house, absent a valid search warrant or the defendant's consent. When asked to consent specifically, the defendant denied permission to search the house.

In the early evening, several hours after the original entry, the officers, while seated on defendant's furniture in defendant's living room, began handwriting an affidavit in support of a warrant to search the premises. The officers thereafter presented the affidavit to a magistrate, and returned with a signed search warrant at approximately 10:30 pm that night. The seizure and destruction of the contraband marijuana began taking place during the afternoon—long before the warrant was issued. Indeed, the entire scene was the subject of a live television news report from inside the property at 6:00 or 7:00 p.m. which showed

---

**1.** Federal Rule of Criminal Procedure 41(c)(2) permits officers to obtain search warrants by telephone.

**2.** While Mr. Seidel was never "free to leave," he was not officially arrested and "mirandized" until after he spoke to his lawyer.

the premises and the marijuana which was being confiscated.

The parties argued a myriad of issues at the hearing for the motion to suppress. These issues included the aerial search, the issue of consent, the defendant's expectation of privacy in the property, whether the structure was a residence or a barn, the extent of the commercial use of the property, and whether the property (or portions thereof) constituted curtilage or an open field.

### Discussion

■ The subjective opinion of the agents, that the structure in question looked like a barn, is irrelevant to the disposition of whether or not it was, in fact, defendant's dwelling house.

The uncontroverted testimony is that the defendant resided on his property for many years. The photographs in evidence clearly demonstrate that Seidel lived in the house, and thus had a reasonable expectation of privacy protected by the Constitution.

The Fourth Amendment prohibits government searches and seizures involving private residences absent a warrant supported by probable cause. This bright line rule is subject to several carefully delineated exceptions. *Thompson v. Louisiana,* 469 U.S. 17, 19–20, 105 S.Ct. 409, 410–11, 83 L.Ed.2d 246 (1984). Because the officers failed to obtain a warrant before entering the premises, the government faces the burden of showing that this search and seizure fits within one of the narrowly tailored exceptions to the warrant requirement of the Fourth Amendment.

### A. *The Issue of Consent*

■ The consent issue, being potentially dispositive, must first be resolved by the court. It is axiomatic that no warrant is required when a party consents to the entry and search of his property.

After hearing all the witnesses, the court finds that the defendant did not consent to the officers' initial entry onto the property. The defendant provided credible testimony that he asked the officers if they had a search warrant. The officer(s) responded "we don't need one, we can come in without one. You have to let us in," or words to that effect. Conversely, the officers' testimony was less believable. When asked at the hearing if the defendant inquired about a search warrant, Agent Thompson responded that he "did not recall" *any* conversation about a warrant *or any* statement of the defendant's that questioned the police's authority to enter the premises. This testimony is belied by Agent Hunt's and the defendant's testimony. Agent Thompson could not recall any part of such a conversation, even though he was present when Agent Hunt told the defendant that they were coming in whether he let them in or not.[3] Hunt's comment was in response to the defendant's objection to their entry onto his property.

The agents here approached the defendant and stated their intention to enter his property. The defendant objected and asked for a warrant. The police responded that none was needed and that they were coming in no matter what defendant did. The defendant's cooperation is not to be confused with consent. Having been told that the police were "coming in anyway," and faced with the choice of having the officers climb over or break down his gate, Mr. Seidel unlocked it and the officers entered.[4] This submission did not constitute "consent" to search. It is undisputed that "where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a lawful claim of authority." *Florida v. Royer,* 460

---

3. That same agent testified that, in his opinion, no warrant was required to conduct a search of defendant's property.

4. The scene at the time is worthy of reiteration. Several police cars had pulled up to the locked gate. At least two officers had guns strapped to

their belts in plain sight while the FDLE helicopter hovered overhead. While the court's finding on the consent issue rests on the testimony at the hearing and not the scene as described above, the court notes for the record the coercive nature of a raid of this type.

U.S. 491, 500, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983).

Because the defendant did not consent to the officers' entry and search of his property, the government must demonstrate that it had other legal justifications to embark on its warrantless search.

### B. *"Aerial Search"*

█ The aerial surveillance conducted by the FDLE agents was completely proper. *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989). In fact, for the purposes of the Fourth Amendment, the aerial viewing from navigable airspace is not even a search. *Id.*, 109 S.Ct. at 696 (describing *California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)). Although *Ciraolo* and *Riley* leave room for challenges to certain aerial observations,[5] no credible testimony exists in this case to consider such a ruling. Simply put, that issue is not before this court.

The problem in this case begins with the agents' actions after they observed the marijuana. In *Riley* and *Ciraolo*, cases which are analogous to the case at bar, the agents *obtained search warrants* based upon the information gathered from the aerial viewing before conducting the search. Here, the agents and officers did not bother to do so.

### C. *Open Field or Curtilage?*

█ The Supreme Court first announced the open fields doctrine in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924). It allows law enforcement officials to enter and search an open field without a warrant. The doctrine has evolved to permit warrantless searches of fields regardless of the particular efforts of a given individual to exclude the public and the police from the property. More specifically, the phrase "open field" is a term of art that includes areas which are neither "open" nor "fields" as society commonly uses those terms. *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 1742, n. 11, 80 L.Ed.2d 214 (1984). Thus, an area of land in secluded woods may be an "open

field" in the eyes of the law. *Id.*, 104 S.Ct. at 1739. While a lay person (or some lawyers for that matter) might find this definition amazing, the logic derives from the fact that the Fourth Amendment protects, *inter alia*, the home and the curtilage of the home, but nothing more.

Distinguishing an open field from curtilage is a question of fact. *United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983), *citing Hodges v. United States*, 243 F.2d 281, 283 (5th Cir.1957) and *Walker v. United States*, 225 F.2d 447, 449 (5th Cir. 1955). As an initial matter the court must determine if the defendant has a reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 350, 88 S.Ct. 507, 510, 19 L.Ed.2d 576 (1967). A defendant's subjective expectation must also be recognized by society as one that is reasonable. *Id.* at 361, 88 S.Ct. at 516.

That this defendant had a subjective expectation of privacy on his property is unquestioned. He maintained a fence, thick trees and shrubs, and a locked gate which kept the public from viewing or entering his property. The second prong of the *Katz* test, whether society deems this expectation reasonable, depends on this court's determination of the open fields/curtilage question.

As a matter of law, no expectation of privacy in an open field is reasonable. *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 1742–43, 80 L.Ed.2d 214 (1984). Consistent with *Oliver*, a party's attempt to erect fences or barriers to keep the public out of an open field is of no account. This is a bright line rule which prevents courts from applying an *ad hoc* case-by-case approach to the steps taken to exclude the public from an open field.

The elements which cannot be taken into account under the open fields doctrine, however, are precisely the factors which in part determine whether the defendant has a reasonable expectation of privacy in his curtilage. In the search and seizure con-

---

**5.** In *Riley*, the Court intimates that some aerial inspections of curtilage might not "pass muster" under the Fourth Amendment. *Riley*, at 697.

text, the court must look to the proximity of area claimed to be curtilage to the home, whether the area is included within the enclosure surrounding the home, the nature of uses to which the area is put, and the steps taken by the resident to protect the area from outside observation. *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 95 L.Ed.2d 326, rehearing denied, 481 U.S. 1024, 107 S.Ct. 1913, 94 L.Ed.2d 519 (1987).

In the instant matter, three of the four factors cited above clearly militate in favor of the defendant. The area claimed to be curtilage is only two and one-half acres in size and is in close proximity to the house. While the lot size is larger than many tracts in Broward County, it is typical for the defendant's neighborhood which is admittedly residential.[6] The government has offered no support for the proposition that the size of defendant's lot precludes it from being curtilage.[7]

The marijuana was not located at the boundaries of defendant's land. The police seized some plants directly behind defendant's home, while other plants were grown in a greenhouse and outside, approximately ten to twenty yards from the back of the house. The farthest rows of marijuana plants were about half-way to the western boundary of defendant's property, approximately sixty yards from the home.[8] In *Oliver* and *Berrong*, the areas found to be open fields were one mile and one quarter of a mile from the respective residences. In comparison, a few hundred yards (to the end of Mr. Seidel's property) constitutes "in close proximity" to the house.

The second *Dunn* factor benefitting the defendant is that the area in question encloses the house and is one parcel with a single boundary. No internal boundaries or fences set off the property or delineate a distinct open area from the back of the

house. In *Dunn*, the house was set off by a fence, thus delineating the curtilage from the open fields. The *Dunn* agents crossed various fences, but never crossed the fence which included the house and marked the area "readily identifiable as part and parcel of the house." *Dunn*, 107 S.Ct. at 1140. Crossing fences is not problematic, "unless the fenced area included the house." *United States v. Williams*, 581 F.2d 451, 453 (5th Cir.1978), cert. denied, *Williams v. United States*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). Here, importantly, the agents crossed the only fence on the property, the fence which marked the boundary of defendant's lot and included his home.

The third factor in defendant's favor (the fourth *Dunn* factor) is the steps he took to protect his home from outside intrusion. Most of those steps have been discussed above. In addition, defendant kept his gate locked at all times. *Any* visitor would have to honk to be let in by the defendant. No one could easily see onto defendant's land and the public was intentionally excluded from access to the home and property.

The court emphasizes that precise distances or acreage cannot mechanically determine that part of the defendant's property is curtilage while part is open field. No such indicator (no fence, tree line, or shrubbery) exists to make that determination. Moreover, Mr. Seidel, as indicated by the government's own photographs, grows trees and plants directly behind his house just as he grows items toward the back of the property. A finding that this area is an open field would be tantamount to finding that *no* portion of the defendant's property is curtilage.

The only factor favorable to the government (the third *Dunn* factor) is the use to which the land is put. The defendant unquestionably used his entire property to

6. The facts of many open field cases, involving farms of hundreds of acres, or secluded fields without residential dwellings, are inapposite to the instant facts.

7. Although not bound by any officer's description of the scene, the court notes, that, ironical-

ly, police reports repeatedly refer to defendant's property as curtilage.

8. The court does not recall any specific testimony on the precise distance from the house to the farthest plants. The court's estimate is based on the photographs in evidence.

grow plants for commercial landscaping purposes. Such a use is not generally considered "among those intimate activities associated with domestic life and the privacies of the home." *Dunn, supra,* 107 S.Ct. at 1139, n. 4. This language cannot be interpreted, however, to restrict the meaning of curtilage to suburban homes on half-acre lots. Much of the law defining curtilage recognizes that, in the absence of a fence or other marker, the outbuildings on a property help define the curtilage. Indeed, a review of many "curtilage" cases reveals that much of the law developed in the context of rural homes with outlying structures or buildings. Depending on the circumstances, said buildings might or might not be within the curtilage. Because this is so, it would be unreasonable to interpret the language in *Dunn* to exclude property solely because the owner uses it in a manner other than for mowing. In other words, simply because defendant utilized his property for mixed purposes does not indicate, in and of itself, that the area loses its character as curtilage. As stated by the Court in *Dunn,* the above factors do not produce a mechanical formula that yields an obviously correct answer. *Id.* 107 S.Ct. at 1139–40.

Having considered all of these factors, the court finds that the property in question is not an open field but instead constitutes the curtilage of defendant's home.

The contrast between this case and the cases the government relies on speaks volumes. In *United States v. Hatch, Berrong,* and *Dunn,* the open fields involved farms, and hundreds of acres of property in rural areas. In *Hatch,* the district court found that an internal fence separated the curtilage from the open field. 931 F.2d 1478, 1481 (11th Cir.1991). No such internal fence or boundary exists on this defendant's property. In *Berrong,* the field in question was a quarter mile from the home. 712 F.2d at 1374. Here, the farthest marijuana plants and even the most distant point of the property are measured in yards, not miles. In *Dunn,* as discussed earlier in this opinion, the agents never crossed the fence which separated the curtilage from the open field. In the case at bar, the officers crossed the fence which defined the curtilage of defendant's home.

The court reiterates that all of these cases involved significantly greater amounts of acreage than the instant case. This case involves a single 2.5 acre lot in a residential area which permits some agricultural uses. Although the above cases stand for valid legal propositions, the facts upon which they were decided cannot be ignored.[9]

A review of the open fields doctrine reveals two distinct scenarios. First, an area may be an open field if it is far removed from a residence. In *Oliver I,* the field was approximately a mile from the house and part of a large farm. Second, and more difficult, are the cases in which the questioned area is near the home. Such were the facts in *Dunn,* and the primary issue then becomes whether the area immediately surrounds the home or if it is somehow separated from the residence and therefore beyond the curtilage. In the instant case, unlike *Dunn,* no such internal divider is present. The defendant *lived* on one undivided lot, the boundaries of which defined the curtilage surrounding his home.

To hold that Mr. Seidel's property is an open field would be an extension of the doctrine that this court is unwilling to make.

### D. *Commercial Curtilage*

■ The open fields/curtilage analysis is fact sensitive, and tends to lead one to the determination that a given area is either curtilage or an open field. Such a choice is misleading. The open fields doctrine stems from the conclusion that the Fourth Amendment does not extend beyond the home and the curtilage. As applied to fields on farms, or areas without resi-

---

**9.** The court does not hold that two and one-half acres of land could never be an open field. Such could be the case if the *Dunn* factors were different. Here, *if* the marijuana was at the end of the property, and *if* the property was separated from the home, then a different holding might be required.

dences, the soundness of the doctrine is virtually unquestioned. In defining an open field, as mentioned earlier, courts have held that the land need not be "open," nor a "field." *Oliver,* 104 S.Ct. at 1742, n. 11. The rationale behind this definition is logical, however, since persons who seek protection in wooded areas have no more reasonable expectations of privacy than those who seek protection in a secluded field. Thus, an area which is not a field can still be an "open field."

The opposite is also true, however, in that just because an area is a field where something grows, that does not mean it is an "open field" for purposes of constitutional law. In the case at bar, much was made of the fact that defendant ran a business on the property in addition to living there. The government's conclusion seems to be that if it is not strictly a house with curtilage, then it must be an open field. The court disagrees. At worst defendant was running a business, but that business also receives protection under the Fourth Amendment. *Dow Chemical v. United States,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986). The fact that the business includes a field does not inherently change the nature of the constitutional issue.

As an alternative holding, the court is persuaded by the decision in *Pearl Meadows Mushroom Farm, Inc. v. Nelson,* 723 F.Supp. 432 (N.D.Cal.1989). In *Pearl Meadows,* the INS made warrantless entries and searches of commercial nurseries which were held to violate those businesses' reasonable expectations of privacy in their commercial curtilage. *Pearl Meadows* at 440–442. The court continually emphasized that the public did not have access to the areas invaded by the INS agents. It added that the "curtilage in these instances is usually an integral part of the commercial establishment and production process. If steps are taken to protect these areas from public intrusion, the business has a reasonable expectation of privacy in the

curtilage to be free from physical entries and searches without a warrant." *Id.* at 440. This court agrees.

The *Dunn* factors discussed above are also applicable in cases of commercial curtilage. The court need not rehash the analysis, other than to say that defendant had a reasonable expectation of privacy in the commercial curtilage of his small wholesale nursery business.

*Conclusion*

The facts herein reveal a case where the Fourth Amendment required a warrant prior to search. The agents in the helicopter, having sighted marijuana on defendant's property, had probable cause to obtain a search warrant. There were no exigent circumstances which required immediate action, and no reason to believe that the marijuana would be moved or destroyed. The warrant could have been obtained from a magistrate or judge during regular business hours without difficulty. Indeed, it could have been obtained by telephone. *See* Federal Rule of Criminal Procedure 41(c)(2). The fact that the police drafted the affidavit for search warrant while sitting in defendant's living room demonstrates their belated belief that a warrant was required. Indeed, one officer was overheard to say, "we should have got a warrant."

The analysis of this issue requires one final observation. Probable cause is not an element of the open fields doctrine. Either the police have the right to search a piece of property as an open field or they do not. Therefore, the fact that the FDLE helicopter spotted marijuana in this defendant's yard is irrelevant. The issue before this court is whether these agents had the right to enter this property without a warrant, with or without probable cause.[10]

■ The government has failed to establish that the police had a right to be on defendant's property without a warrant,

10. Consider if the agents had done the same exact thing without the benefit of the aerial observation. To allow the search in the case at bar on the basis of the open fields doctrine would necessarily require the same holding in a case where the police acted randomly and without probable cause. The Fourth Amendment prohibits such conduct.

and hence the motion to suppress must be granted.

The only issue then remaining is whether *all* the evidence must be suppressed. Because the initial entry was illegal, the plain view doctrine does not apply to this case. In addition, because the initial entry and search was illegal, any consent for the officers to enter and use the phone in defendant's house was invalid. Indeed, the entire process was irreparably tainted by the initial illegal entry onto the property, and hence any items seized in plain view in the house must also be suppressed.

Furthermore, because the search warrant affidavit contained much information gathered pursuant to the unlawful entry, any items seized thereunder must likewise be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963); *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 2535, 101 L.Ed.2d 472 (1988).

Accordingly, it is hereby ORDERED AND ADJUDGED that the defendant's Motion to Suppress be and the same is hereby GRANTED in all particulars and the evidence which is the subject thereof is hereby suppressed.

DONE AND ORDERED.