**Wilbur K. HART, et al.**

v.

**William MYERS, et al.**

**No. 3:97CV2574(SRU).**

United States District Court,
D. Connecticut.

Jan. 23, 2002.

John R. Williams, Williams & Pattis, New Haven, CT, Angelica N. Papastavros, New Haven, CT, for plaintiffs.

David H. Wrinn, Robert B. Teitelman, Attorney General's Office, Hartford, CT, for defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

UNDERHILL, District Judge.

Wilbur Hart, William Hart, Douglas Hart and Robert Trapp sued William Myers, Thomas Welch, and Rick Lewis, conservation officers employed by the Department of Environmental Protection of the State of Connecticut for alleged violations of 42 U.S.C. § 1983. Plaintiffs claim defendants, acting in their individual capacities, conducted an unconstitutional search, seizure and arrest in violation of the Fourth Amendment of the United States Constitution. Specifically, plaintiffs claim that, because the conservation officers entered within the curtilage of plaintiffs' home, the officers' failure to have probable cause and warrants to conduct their search, seizure and arrests violated the Fourth Amendment.

The defendants filed a motion for summary judgment (doc. # 36), arguing both that their activities took place in open fields, where plaintiffs enjoy no Fourth Amendment rights, and that their actions are protected by qualified immunity.

Under the facts and circumstances of this case, reasonable jurors could find that the area in which the search and seizure occurred was within the curtilage of the plaintiffs' home. Even if the area constituted curtilage, however, the officers' conduct is protected by qualified immunity. Therefore, the defendants' motion for summary judgment **(doc. # 36) is granted**.

## FACTS

This claim arises out of events that occurred on December 28, 1996 on a piece of property located in East Haddam, Connecticut and owned by Florence Hart ("the property"). The parties do not dispute the subordinate facts material to this ruling. Because the extent of the curtilage surrounding plaintiffs' home is a fact-intensive determination, however, the geographical layout and character of the property will be set forth in some detail.

### The Property

The property is an undeveloped tract of fifty acres, which the owner has designated as open space. Devil's Hopyard State Park, Connecticut state parkland on which no hunting is allowed, shares a border with part of the property. The property is not fenced in and there were no boundary markers in place at the time of the events at issue.[1] Along portions of the property lines, there are some very old stone walls.

---

1. Plaintiffs claim in their papers that the boundary between Devil's Hopyard and the property is marked by Connecticut State metallic, silver tags that are nailed to the trees. Defendants claim that these markers were placed on the trees after December 22, 1996. At oral argument, plaintiffs did not object to defendants' statement that the markers were not in place on December 28, 1996. *See*

The family of Florence Hart uses the property for a number of activities, including hunting (in November and December), fishing, archery, camping, cutting firewood, family get-togethers and retreats. Vehicles enter the property by means of an unmarked, unimproved access way off a thoroughfare, Tater Hill Road.[2]

At the end of the access way is a clearing. At the opposite side of the clearing, to the north,[3] on the edge of the clearing, but in the woods, is a small, wooden structure. The Hart family has used the structure for storage, cooking, playing cards, changing clothes and sleeping. There is a fire pit approximately ten to fifteen feet to the south of the structure at the edge of the clearing, but in the trees. To the east of the fire pit, there is a table built into the trees and past the table, in the near vicinity, is usually a pile of stacked firewood. There is both an old and a modern outhouse to the north of the structure.

The structure is surrounded on the western and northern sides by dense undergrowth in the woods. The plaintiffs planted some of the trees in the heavily wooded area to the north of the structure specifically to afford some privacy for the people using the structure and the outhouse. The eastern side of the structure is also surrounded by woods, but without thick undergrowth. The differentiation in undergrowth density appears to be a natural transition and is visible only upon close inspection. To the east of the structure, a logging road leads northeast from the clearing into the woods. There are trees between the logging road and the structure. On the eastern side of the logging road, approximately twenty-five yards to the east of the structure, is a sapling tied between two trees ("hangpole"). The hunters use this hangpole to hang deer carcasses. The hangpole is located in the woods near the edge of the clearing.

### The Search and Seizure

On December 28, 1996, while on the job, Officers Myers and Lewis heard rifle shots coming from the location of the state park. Myers and Lewis, along with Officer Welch, who was also present, decided to investigate. The officers parked their cars and entered the woods on foot near where the state park abuts the property. During their investigation, the officers observed no signs or other markers indicating property lines. Lewis and Welch returned to their cars because of approaching darkness and equipment failures, resulting in a loss of communication with Myers.

Myers was not familiar with these woods. During his investigation, Myers discovered a fresh pile of deer entrails in the woods. He followed the dragline of the deer. The dragline went to the logging road on the property, down the logging road and then over to the hangpole. Two deer were suspended from the hangpole. Myers saw no tags on the deer.

At that time, William Hart was at the firepit near the cabin. From where Myers was standing at the hangpole, he saw William Hart tending the campfire and he saw

---

Transcript of Oral Argument dated January 9, 2001 ("Tr.") at 12.

**2.** Plaintiffs agreed that the photographs attached to the defendants' memorandum as exhibits and presented at oral argument (Exhibits C–1 to C–19) accurately depict the scene during the winter months, despite the fact they were taken during the summer months. *See* Tr. at 13.

**3.** For convenience, descriptions of the scene are based on the orientation of one standing before the structure, where the structure is assumed to lie to the north and Tater Hill Road is assumed to lie to the south. All directional descriptions of the property in this ruling are based on this fictional orientation.

the structure. Myers stayed near the hangpole, but stepped forward out of the woods into the clearing, so that William Hart would see him. William Hart approached Myers. Myers stayed near the hangpole and questioned William Hart about the deer and whether William Hart had permits or tags. At some point, Myers identified himself as a conservation officer.

During this conversation, which occurred after sunset, three other hunters, Robert Trapp, Lelio Shimuzu, aged 14, and Wilbur Hart came into the clearing from the woods. None of the three was wearing fluorescent orange clothing. These hunters had brought in a third untagged deer. The three hunters approached Myers and William Hart, and Myers repeated his questions to each of them.

After the arrival of the third hunter, Myers reestablished contact with Lewis. Myers informed Lewis that he was with three adult hunters, who had guns and three untagged deer, and that he needed assistance. The hunters assisted Myers in providing Lewis and Welch directions to their location. Lewis and Welch drove to the property on the access way off Tater Hill Road.

Once Lewis and Welch arrived, all three officers spoke with the hunters about permits, tags, loaded rifles, the juvenile's hunting and killing of a deer, and Robert Trapp's hunting and killing of a deer. After the questioning, the officers decided to charge the three hunters with statutory violations. At all times, Myers and Welch remained near the hangpole. As a result

of the conversation with the hunters, it became apparent to the officers that a fourth adult hunter, Douglas Hart, was in the woods and most likely armed. Lewis walked over to the structure and around its immediate area, calling for the fourth hunter. Douglas Hart did not respond to Lewis' calls.

Soon thereafter, Douglas Hart came out of the woods in response to his father's call over a patrol vehicle's PA system. Douglas Hart wore no orange clothing. The officers questioned Douglas Hart about hunting regulations, and eventually decided to charge him, too, with statutory violations.

During the investigation, the atmosphere was tense, but no one asked the officers to leave the property. The interviews were conversational in tone and the hunters were cooperative. Myers' visit lasted approximately two hours. Lewis and Welch were on the property for approximately one hour. After charging the hunters with statutory violations, the officers seized two guns and the three deer that the hunters had killed.

## DISCUSSION

Plaintiffs contend that the defendants were within the curtilage of plaintiffs' home and therefore needed probable cause and a warrant for the search, seizure and arrests. Defendants argue that they were not within plaintiffs' curtilage, but in open fields, and therefore they did not need probable cause and a warrant to conduct a search, or a warrant to seize property or arrest persons.[4] In addition, defendants

---

4. Whether issuing summonses for statutory violations constituted an arrest or not, plaintiffs have produced sufficient evidence to create a genuine material issue of fact as to whether they were seized. *See United States v. Glover,* 957 F.2d 1004, 1008 (2d Cir.1992) (consensual encounter is not seizure implicating Fourth Amendment protections; however,

a limited investigative stop of an individual is a seizure under the Fourth Amendment and requires "a reasonable suspicion supported by articulable facts that criminal activity' may be afoot" and "an arrest—plainly a Fourth Amendment 'seizure'... must be based on probable cause.... To determine whether a 'seizure' has occurred triggering the Fourth

argue that, at the time the officers charged the plaintiffs with statutory and regulatory violations, probable cause existed. Thus, defendants assert there was no violation of the plaintiffs' Fourth Amendment rights. Finally, defendants argue that, even if they violated plaintiffs' Fourth Amendment rights, they are entitled to qualified immunity from suit.

### Standard of review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a summary judgment motion, the court must construe the facts in a light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings, but rather must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

To present a genuine issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Even if the nonmoving party's evidence appears "implausible," the court may not "weigh" the evidence and must proceed with the greatest caution. *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 58–59 (2d Cir.1997). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions...." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2102, 147 L.Ed.2d 105 (2000). If reasonable minds could differ over the import of the evidence, and if there is any evidence in the record from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment. *R.B. Ventures, Ltd.,* 112 F.3d at 58–59.

If, however, the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548; *accord, Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (movant's burden satisfied if

Amendment's protections, a court must consider 'if, in view of all of the circumstances surrounding the [encounter], a reasonable person would have believed that he [or she] was not free to leave.'"); *Murphy v. Lynn,*

118 F.3d 938, 946 (2d Cir.1997) ("a person is 'seized', when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court").

it can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

### Legal Framework

*Fourth Amendment Protections*

"The law distinguishes between the curtilage—the land immediately surrounding the home and, thus, considered a part of it—which is entitled to Fourth Amendment [5] protection, and the land outside the curtilage, which, though it might be on the same private property, is not so protected." *United States v. Schuster*, 775 F.Supp. 297, 306 (W.D.Wis.1990) (citing *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)); *see also United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (citing *Hester v. United States*, 265 U.S. 57, 59, 44 S.Ct. 445, 68 L.Ed. 898 (1924) for its holding that "Fourth Amendment protections ... did not extend to the open fields."); *United States v. Basile*, 569 F.2d 1053, 1056 (9th Cir.1978) ("Fourth Amendment's protections do not extend to the 'open field' area surrounding a dwelling and the immediately adjacent curtilage, ... information gained as a result of a civil trespass on an 'open field' area is not constitutionally tainted, nor is the search and seizure which ultimately results from acquiring that information.").

■ The Fourth Amendment affords the same protections to curtilage that it does to the home. *See Oliver*, 466 U.S. at 180, 104 S.Ct. 1735 ("only the curtilage, not the neighboring open fields, warrants the Fourth Amendment protections that attach

to the home. ... [curtilage] has been considered part of home itself for Fourth Amendment purposes."); *see also Dunn*, 480 U.S. at 300, 107 S.Ct. 1134 (curtilage afforded same protection under the law as the home itself).

In general, to search, seize property from, or arrest a person in that person's home, the Fourth Amendment requires a state actor to have probable cause and a warrant, absent "exigent circumstances or some other exception." *United States v. Gori*, 230 F.3d 44, 50 (2d Cir.2000); *see also United States v. Lace*, 669 F.2d 46, 56 (2d Cir.1982) ("absent exigent circumstances a warrantless search of one's home or its curtilage, when effected through trespass, violates the fourth amendment."); *United States v. Baldwin*, 691 F.2d 718, 721 (5th Cir.1982) ("whereas open fields are not deemed to fall within the protective ambit of the fourth amendment, the curtilage, or the immediate appurtenances, of a home may not be searched without a warrant, absent exigent circumstances.").

■ On the other hand, the land outside the curtilage— open fields— is excepted from the warrant requirement of the Fourth Amendment and is entitled to no more protection than public land. *Oliver*, 466 U.S. at 172, 179 n. 10, 104 S.Ct. 1735 ("The 'open fields' doctrine, first enunciated by this Court in *Hester v. United States*, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), permits police officers to enter and search a field without a warrant."); *United States v. Reilly*, 875 F.Supp. 108, 114 (N.D.N.Y.1994) ("Supreme Court expressly recognized an exception to the search warrant requirement when it upheld a warrantless search conducted in an open field."); *Williams v. Garrett*, 722

---

**5.** The Fourth Amendment provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause." U.S. CONST. amend. IV.

F.Supp. 254, 259 (W.D.Va.1989) (defendants argued that the "area searched was outside the curtilage of the ... home, and therefore falls under the 'open fields' exception to the warrant requirement.").

■ State actors, therefore, do not need probable cause or a warrant to enter and search an open field. *United States v. Pinter,* 984 F.2d 376, 379 (10th Cir.), *cert. denied,* 510 U.S. 900, 114 S.Ct. 273, 126 L.Ed.2d 224 (1993) ("The Open Fields Doctrine does not require that law enforcement officials have some objective reason— either probable cause or reasonable suspicion— before entering an open field."); *United States v. Johnson,* 256 F.3d 895, 910 (9th Cir.2001) ("The Fourth Amendment, as the Supreme Court has interpreted it, permits the police to search all over your land, so long as the officers don't cross the boundaries of your home."); *United State v. Seidel,* 794 F.Supp. 1098, 1105 (S.D.Fla.1992) ("Probable cause is not an element of the open fields doctrine. Either the police have the right to search a piece of property as an open field or they do not.").

■ Likewise, although state actors do need probable cause, they do not need a warrant to seize property from or make an arrest in open fields. *See* 3 W.R. LAFAVE, SEARCH AND SEIZURE § 3.1(a), at 4–5; § 6.1(a), at 223–24 (3d ed.1996); *Payton v. New York,* 445 U.S. 573, 587, 590 n. 30, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("well settled that objects such as weapons or contraband found in a public place may be seized by the police without a warrant ... assuming that there is probable cause to associate the property with criminal activity; ... permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest"); *Gori,* 230 F.3d at 50 ("Fourth Amendment

does not require a police officer to obtain a warrant before making a felony arrest in a public place, *see United States v. Watson,* 423 U.S. 411, 418 n. 6, 96 S.Ct. 820, 46 L.Ed.2d 598, (1976); or seizing an item in plain view if there is cause to believe that it is evidence of crime, *see Arizona v. Hicks,* 480 U.S. 321, 326, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).").

■ Moreover, because warrantless searches are presumptively unreasonable, *Williams,* 722 F.Supp. at 260 (citing *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)), it is the government's burden to show that a warrantless search, seizure or arrest "fits within one of the narrowly tailored exceptions to the warrant requirement of the Fourth Amendment." *Reilly,* 875 F.Supp. at 114 (quoting *United States v. Seidel,* 794 F.Supp. 1098 (S.D.Fla.1992)) (evidence suppressed because police conducted warrantless search of curtilage area surrounding home).

*Defining Curtilage*

■ It is well established that curtilage is "the land immediately surrounding and associated with the home." *See, e.g., Oliver,* 466 U.S. at 180, 104 S.Ct. 1735 (citing 4 W. Blackstone, *Commentaries* at 225). "The curtilage can be conceived of as that area inside a line which divides the private confines of the home from the surrounding open fields. What constitutes the curtilage is a question of fact." *Williams,* 722 F.Supp. at 260.

Conversely, "the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage." *Lace,* 669 F.2d at 54. "An open field need be neither 'open' nor a 'field' as those terms are used in common speech." *Id.* "For example ... a thickly wooded area nonetheless may be an open field as that term is used in

construing the Fourth Amendment." *Oliver,* 466 U.S. at 180 n. 11, 104 S.Ct. 1735.

Because open fields are defined as the area outside the curtilage, the open fields exception to the warrant requirement frequently requires identification of the reach of curtilage. "The concept of curtilage, unfortunately, evades precise definition." *United States v. Shroyer,* 1998 WL 1585819, at *3 (S.D.Ohio 1998). A review of the development of the doctrine of curtilage in the search and seizure context does, however, prove instructive.

"At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *California v. Ciraolo,* 476 U.S. 207, 212, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986) (quoting *Oliver,* 466 U.S. at 180, 104 S.Ct. 1735 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886))). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Id.* at 212, 213, 106 S.Ct. 1809.

Further,

the protection afforded to curtilage is grounded in the peculiarly strong concepts of intimacy, personal autonomy and privacy associated with the home. The home is fundamentally a sanctuary, where personal concepts of self and family are forged, where relationships are nurtured and where people normally feel free to express themselves in intimate ways. The potent individual privacy interests that inhere in living within a home expand into the areas that enclose the home as well. The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is not true simply in a me-

chanical sense because the areas are geographically proximate. It is true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house. Personal interactions, daily routines and intimate relationships revolve around the entire home place. There are compelling reasons, then, for applying Fourth Amendment protection to the entire dwelling area.

*United States v. Jenkins,* 124 F.3d 768, 772 (6th Cir.1997) (quoting *Dow Chemical Co. v. United States,* 749 F.2d 307, 314 (6th Cir.1984), *aff'd,* 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986)).

■ Therefore, "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *Dunn,* 480 U.S. at 300, 107 S.Ct. 1134 (citing *Oliver,* 466 U.S. at 180, 104 S.Ct. 1735). "[F]ederal courts have historically defined curtilage 'by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private.'" *Jenkins,* 124 F.3d at 772 (quoting *Oliver,* 466 U.S. at 180, 104 S.Ct. 1735). The Fourth Amendment, however, does not "protect the merely subjective expectation of privacy," but only "those 'expectation[s] that society is prepared to recognize as *reasonable.*'" *Reilly,* 875 F.Supp. at 114 (quoting *Katz,* 389 U.S. at 361, 88 S.Ct. 507).

■ "[T]he question of whether a particular person has a reasonable expectation of privacy in a particular part of her or his land ... so as to make that piece of land part of that person's curtilage, is the type of factual inquiry suited to primary resolution by a district court." *Reilly,* 76 F.3d at 1275–76. "[E]very curtilage determina-

tion is distinctive and stands or falls on its own unique set of facts." *Id.* (quoting *United States v. Depew,* 8 F.3d 1424, 1426 (9th Cir.1993)).

■ The law identifies four factors to be used to determine "whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver,* 466 U.S. at 180, 104 S.Ct. 1735. These four factors are: "1) the proximity of the area claimed to be curtilage to the home, 2) whether the area is included within an enclosure surrounding the home, 3) the nature of the uses to which the area is put, and 4) the steps taken by the resident to protect the area from observation by people passing by." *Reilly,* 76 F.3d at 1276 (quoting *Dunn,* 480 U.S. at 301, 107 S.Ct. 1134).

These factors are not exclusive and should not be applied mechanically. *Dunn,* 480 U.S. at 301, 107 S.Ct. 1134; *Reilly,* 76 F.3d at 1276. They should be used as "analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn,* 480 U.S. at 301, 107 S.Ct. 1134; *see also Reilly,* 76 F.3d at 1276. The touchstone of the inquiry, therefore, remains "whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life.'" *Reilly,* 875 F.Supp. at 115 (quoting *Dunn,* 480 U.S. at 301, 107 S.Ct. 1134 (quoting *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886))).

### Analysis

In the context of deciding a summary judgment motion based on the defendants' contention that their activities took place in an open field, the critical question is whether there are any genuine issues of material fact that prevent the court from reaching a legal conclusion about the scope of the Fourth Amendment protections plaintiffs enjoyed in the area of the hangpole. Because it is the defendants' burden to prove they come within the open-fields exception to the warrant requirement, *see Reilly,* 875 F.Supp. at 114, any failure to produce sufficient evidence of the specific facts on which the claimed exception depends will require denial of summary judgment because a genuine issue of material fact will remain for resolution by the jury.

The somewhat unusual circumstances here— a rustic wooden structure, at best a part-time residence, located in the middle of deep woods— make a determination of the scope of curtilage more difficult. In the more typical setting of year-round residential homes, whether urban, suburban or rural, the area of curtilage surrounding a home will be more obvious. *See Dunn,* 480 U.S. at 302, 107 S.Ct. 1134, *quoting Oliver,* 466 U.S. at 182 n. 12, 104 S.Ct. 1735 ("for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience."); *Johnson,* 256 F.3d at 917 ("in most cases, the curtilage will be clearly marked"). Under the circumstances of this case, the defendants have not produced sufficient evidence to eliminate a genuine issue of material fact whether the area around the hangpole is within the curtilage of plaintiffs' cabin.

The parties agree on the legal definitions of curtilage and open fields. They dispute, however, whether: (A) the structure on the property was a home, from which curtilage could extend, (B) even if the structure was a home for the purpose of Fourth Amendment protection, whether the hangpole area falls within the curtilage

surrounding the home; and (C) if the hangpole area was curtilage, whether the officers are entitled to qualified immunity.

### A. *Whether the Structure is a Home*

 From the evidence submitted, there is a genuine issue of material fact whether the structure on the property was a home. *See, e.g., Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) (hotel rooms are homes for purposes of Fourth Amendment); *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (rooms in rooming houses); *United States v. Kim,* 27 F.3d 947, 963 (3d Cir.1994) (citing *United States v. Gooch,* 6 F.3d 673, 677 (9th Cir.1993) (tent pitched in public campground)); *Smyth v. Lubbers,* 398 F.Supp. 777 (W.D.Mich.1975) (college dorms); *see also United States v. McIver,* 186 F.3d 1119, 1126 (9th Cir.1999), *cert. denied,* 528 U.S. 1177, 120 S.Ct. 1210, 145 L.Ed.2d 1111 (2000) ("person can have a reasonable expectation of privacy in a hotel room, a cabin, or an enclosed tent on public lands."); *People v. Schafer,* 946 P.2d 938, 944 (Colo.1997) ("Visitors and residents of Colorado who choose to stay in a hotel room, cabin, or tent away from their permanent abode presumptively enjoy Fourth Amendment protection.").

Although the structure has much in common with a storage shed, there is evidence from which a reasonable juror could find that plaintiffs used the structure for sleeping as well as other privacies of the home. Therefore, granting summary judgment to defendants on this ground is not appropriate.

### B. *Whether the Events Occurred in Open Fields or in Curtilage*

Assuming the Hart structure was a home, the relevant issue becomes whether the hangpole area in which the search and seizure occurred was curtilage, and thereby protected by the Fourth Amendment, or an open field, not subject to Fourth Amendment protection. That issue should be resolved using the four factors identified above. Applying the four factors to the evidence the defendants presented, reasonable jurors could conclude that the hangpole area was curtilage.

*Factor 1—Proximity to the home of the area claimed to be curtilage.*

 Although curtilage cannot be defined as the area within a fixed distance from the home, the closer the area is to the home, the more reasonable an inference that the area is curtilage. *See, e.g., Reilly,* 76 F.3d at 1277 (Whether an "area harbor[ed] the intimate activity associated with the sanctity of a man's home and the privacies of life ... cannot be rejected on the ground of distance alone.") (internal quotation marks and citations omitted). The distance from the home over which curtilage extends must be determined on a case-by-case basis. *Johnson,* 256 F.3d at 902 (citing *Dunn,* 480 U.S. at 301, 107 S.Ct. 1134).

Courts have noted that "the curtilage of a home in a rural area could extend farther than the curtilage of a home in an urban or suburban setting." *Id.* (citing *Reilly,* 76 F.3d at 1277 ("on a large parcel of land, a pond 300 feet away from a dwelling may be as intimately connected to the residence as is the backyard grill of the bloke next door")).

Here, the hangpole was approximately twenty-five yards away from the structure. That distance is fairly short and could support an inference that the hangpole should be treated as part of the home. This is especially true in the outdoor or camp-like setting at issue here, because more of the activities intimately associated with the home will likely be conducted

outside this home, which lacked plumbing, a stove and private sleeping quarters.

*Factor 2—Whether the area is included within an enclosure surrounding the home.*

"Fencing configurations are important factors in defining the curtilage." *Dunn,* 480 U.S. at 301 n. 4, 107 S.Ct. 1134. Nevertheless, the Supreme Court has rejected a bright line rule that "the curtilage should extend no farther than the nearest fence surrounding a fenced house." *Id.* ("Application of the ... 'first fence rule' might well lead to diminished Fourth Amendment protection in those cases where a structure lying outside a home's enclosing fence was used for such domestic activities. And, in those cases where a house is situated on a large parcel of property and has no nearby enclosing fence, the ... rule would serve no utility; a court would still be required to assess the various factors outlined above to define the extent of the curtilage."); *see also Johnson,* 256 F.3d at 902 ("While not conclusive, 'fencing configurations are important factors in determining curtilage,'" *quoting Dunn,* 480 U.S. at 301 n. 4, 107 S.Ct. 1134).

▮ Natural "barriers satisfy the requirements of an enclosure." *Reilly,* 76 F.3d at 1277–76 ("finding that hedgerows and thick trees created a sufficient enclosure to determine curtilage."); *Johnson,* 256 F.3d at 902 ("In rural pieces of property, as here, natural boundaries such as thick trees or shrubberies may also indicate an area 'to which the activity of home life extends.'") (quoting *Dunn,* 480 U.S. at

302, 107 S.Ct. 1134 (quoting *Oliver,* 466 U.S. at 182, 104 S.Ct. 1735)). Here, reasonable jurors could find that the woods surrounding the clearing where the structure sits serve as a natural enclosure of the clearing, and thus that this factor weighs in favor of finding that the clearing constitutes curtilage. Because the hangpole stands in the lightly wooded transitional area between the open clearing and the deep woods, reasonable jurors could also find that the hangpole is on the outermost edge of a the curtilage.[6]

*Factor 3—The nature of the uses to which the area is put.*

This factor requires consideration of whether the property is used to "harbor those intimate activities associated with domestic life and the privacies of home." *Reilly,* 76 F.3d at 1277–78 (using the area for fishing, swimming (at times naked), croquet, cooking, and sexual intercourse suffices). The Second Circuit has determined that the relevant inquiry is the actual use of the property, not the knowledge that the officers had or should have had about use at the time of their entry. *Id.* at 1278 (citing *Dunn,* 480 U.S. at 305, 107 S.Ct. 1134 (Scalia, J., concurring in part) ("What is significant is that the barn was not being ... used [for intimate activities of the home], whether or not the law enforcement officials knew it.")).

Here, there is evidence that the hangpole area was actually used for cutting up deer that had been hunted, parking cars, and hanging sleeping bags.[7] Those uses

---

6. Plaintiffs' claim that the hangpole area is curtilage because it is within the old stone walls that are located at some of the property lines is without merit. *See Johnson,* 256 F.3d at 917 ("Under *Dunn,* a perimeter fence surrounding a property does not designate the curtilage."); *Seidel,* 794 F.Supp. at 1103 ("Consistent with *Oliver,* a party's attempt to

erect fences or barriers to keep the public out of an open field is of no account.").

7. Plaintiffs' argument that the hang pole, fire pit and cabin are "intrinsically related to the property and its uses" misses the mark. Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment

do not suggest any particularly private or intimate activity. Nevertheless, a reasonable jury could find, under the circumstances of this case, that those uses were sufficiently associated with domestic life and the privacies of the home in the camp-like setting at issue here. *See Jenkins,* 124 F.3d at 773 (activities such as using "this area for such things as hanging their wet laundry on a clothesline to dry" are related to the intimate activities normally associated with the home).

*Factor 4—Steps taken by the resident to protect the area from observation by people passing by.*

This factor concerns the steps plaintiffs took to protect the hangpole area from observation by people passing by. *Dunn,* 480 U.S. at 303, 107 S.Ct. 1134; *Reilly,* 76 F.3d at 1276. Merely placing the hangpole in a secluded area does not give rise to Fourth Amendment protection. *People v. Channing,* 81 Cal.App.4th 985, 990, 994, 97 Cal.Rptr.2d 405 (2000) (plaintiff intentionally placed marijuana plants in geographically remote area that was not as matter of course accessed by members of the general public or law enforcement officers; court held that "intentional placement of marijuana in a secluded area does not demonstrate the reasonableness of a criminal defendant's expectation of privacy."); *Schuster,* 775 F.Supp. at 300–01 (where area was devoted to "the surreptitious cultivation of contraband and situated in otherwise undeveloped woodland" and nothing was done to protect it from observation; "simply hiding them in the woods in their natural state is not enough."). Particularly because plaintiffs' home was situated in the woods and not in a residential area that would more clearly convey indicia of private ownership, it is even more impor-

tant for the plaintiffs to make their subjective expectations of privacy clear to an outside observer. *See California v. Ciraolo,* 476 U.S. 207, 211–12, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *Katz,* 389 U.S. at 360–61, 88 S.Ct. 507. They did not do so in the hangpole area.

▮ Plaintiffs took no steps, other than placing the hangpole in a secluded wooded area, to protect the area from observation by people passing by. Although their "efforts" do not strengthen plaintiffs' position, neither does plaintiffs' lack of effort, under the circumstances, preclude reasonable jurors from finding that the hangpole stood within the curtilage around the structure.

Considering the four factors together, *see Reilly,* 76 F.3d at 1279, defendants failed to carry their burden to prove that their activities took place in an open field. Reasonable jurors could find that the hangpole area is within the curtilage of the home on the property.

### C. *Whether the Officers Enjoy Qualified Immunity*

The defendants argue that, even if the open-fields exception to the warrant requirement does not apply, they are nevertheless entitled to qualified immunity. The officers are entitled to qualified immunity: [1] "if the plaintiff's right ... was not clearly established at the time of the conduct; or [2] if the defendant's action was objectively legally reasonable in light of legal rules that were clearly established at the time it was taken." *X–Men Security, Inc. v. Pataki,* 196 F.3d 56, 66 (2d Cir.1999); *see also Daughenbaugh v. Tiffin,* 150 F.3d 594, 603 (6th Cir.1998).

Under the first prong,

("Pl.Mem.") at 19. The task is to determine whether the hangpole area is used to "harbor those intimate activities associated with domestic life and the privacies of home," not whether the hangpole area is intrinsically related to the property as a whole and its uses.

[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal citations omitted).

Under the second prong, qualified immunity applies if "officers of reasonable competence could disagree" about the legality of the defendants' actions. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). "An officer's actions will be found objectively unreasonable, and summary judgment will be denied only if 'no officer of reasonable competence could have made the same choice in similar circumstances.'" *Id.* at 420–21.

■■■ At the time of these events, it was clearly established that officers may not search, seize property from or make an arrest on the curtilage of a home without probable cause and a warrant. When faced with a difficult and complex question whether the hangpole stood in open fields or curtilage, the defendants here did not take any actions that were objectively unreasonable in light of established law.

The hangpole stood in the woods on the edge of a clearing. On the approach taken by the officers, there was nothing about the surrounding woods to suggest the demarcation of a domestic enclosure. An officer moving through the woods could reach the hangpole without reasonably understanding that he had come to an area no longer part of the surrounding open fields. From Myers' perspective at the time he entered the hangpole area, the topography of the land and the landmarks did not

suggest that the hangpole area was being used for those intimate activities associated with home life. Thus, upon Myers' entrance, there was no indication that the hangpole was within curtilage surrounding a home. In addition, Myers did not see the structure until he had entered the hangpole area in the approaching darkness. From its physical characteristics, it would not have been obvious to a reasonable observer that the structure was considered a home. Even so, with the exception of the safety sweep, Myers and the other officers stayed away from the structure and on the other side of the logging road and clearing, near the hangpole. In light of all the facts and circumstances, including the physical relationship of the hangpole to the structure, the officers could have reasonably believed that the hangpole area was not within the curtilage of a home.

In addition, based on the facts of this case, it was objectively reasonable for the officers to believe that the area they entered was not curtilage and that they were therefore entitled to enter and search it without probable cause and a warrant, and seize property from and make arrests on it without a warrant. Myers had made his entrance through the logging road from the state park. Welch and Lewis made their entrances through the access way off Tater Hill Road. At the time of Myers' entrance, he had objective data, including a trail of deer entrails leading to a hanging deer, that the area was being used for hunting purposes. Also, because Myers could see that the hanging deer carcass was untagged, he had objective evidence that the area was being used for illegal hunting purposes. In contrast, Myers had no objective evidence that the area was also being used for those activities associated with the privacies of domestic life.

Because reasonable officers could disagree about the legality of the defendants actions, qualified immunity protects them from liability.

## CONCLUSION

The officers are entitled to qualified immunity. Accordingly, their motion for summary judgment is granted on that ground. The clerk is instructed to close the file.

It is so ordered.